Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
July 3, 2017

**2017 CO 81**

**No. 15SC502, <u>Julie Keim v. Douglas County School District</u>—Campaign Finance—Fair Campaign Practices Act—Campaign Contributions**

The supreme court reviews the court of appeals' conclusion that a school district did not make a prohibited contribution in a school board election campaign under section 1-45-117(1)(a), C.R.S. (2016), of Colorado's Fair Campaign Practices Act and the definition of "contribution" in article XXVIII, section 2(5)(a)(IV) of the Colorado Constitution. The supreme court holds that under section 2(5)(a)(IV), a "contribution" requires that (1) something of value (2) be given to a candidate, directly or indirectly, (3) for the purpose of promoting the candidate's nomination, retention, recall, or election. Here, the school district commissioned and paid for a report supportive of the district's reform agenda using public funds. However, because the school district did not give something, directly or indirectly, to any candidate when it publicly disseminated an email containing a link to the report, the supreme court concludes the school district did not make a prohibited "contribution" under these Colorado campaign finance provisions. The supreme court therefore affirms the judgment of the court of appeals.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 81

**Supreme Court Case No. 15SC502**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA268

### Petitioner:

Julie Keim,

v.

### Respondent:

Douglas County School District.

## Judgment Affirmed
*en banc*
July 3, 2017

**Attorneys for Petitioner:**
Fairfield and Woods, P.C.
Craig D. Joyce
Lee Katherine Goldstein
  *Denver, Colorado*

**Attorneys for Respondent:**
Brownstein Hyatt Farber Schreck, LLP
Jason R. Dunn
Joshua A. Weiss
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Common Cause:**
Ireland Stapleton Pryor & Pascoe, PC
Benjamin J. Larson
  *Denver, Colorado*

**Attorney for Amicus Curiae Colorado Ethics Watch:**
Luis Toro
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Secretary of State:**
Cynthia H. Coffman, Attorney General
Frederick R. Yarger, Solicitor General
Matthew D. Grove, Assistant Solicitor General
  *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE GABRIEL** does not participate.

¶1    In 2013, Douglas County School District (the "District") used public funds to commission a white paper (the "Hess Report") supportive of the District's reform agenda. The Hess Report referenced an upcoming school board election and briefly profiled existing school board members, all of whom supported the reform agenda. The District included a link to the Hess Report in an email distributed to 85,000 Douglas County residents several weeks before the November 2013 school board election.

¶2    We are asked to decide whether the Hess Report was a prohibited campaign "contribution" under section 1-45-117(1)(a)(I) of Colorado's Fair Campaign Practices Act ("FCPA" or the "Act"), sections 1-45-101 to –118, C.R.S. (2016), and article XXVIII, section 2(5)(a)(IV) of the Colorado Constitution. The FCPA prohibits state government entities and political subdivisions of the state from making any "contribution" in "campaigns involving the nomination, retention, or election of any person to any public office." § 1-45-117(1)(a)(I), C.R.S. (2016). Under the state constitution, a "contribution" includes, among other things, "[a]nything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election." Colo. Const. art. XXVIII, § 2(5)(a)(IV). Because the District did not give the Hess Report, directly or indirectly, to any school board candidate when it disseminated the email containing a link to the report to Douglas County residents, we conclude the District did not make a prohibited "contribution" in a campaign under these Colorado campaign finance provisions. Accordingly, we affirm the judgment of the court of appeals.

# I. Facts and Procedural History

¶3 Petitioner Julie Keim was a candidate for one of four open seats in the 2013 Douglas County school board election. Douglas County School District is a political subdivision of the State subject to the FCPA. See Bagby v. Sch. Dist. No. 1, 528 P.2d 1299, 1302 (Colo. 1974). According to Keim, after the 2009 school board election, the District began implementing a conservative "reform agenda," which she characterized as "[school] choice-focused" and supportive of charter schools. The 2011 election brought in three additional reform agenda board members; thereafter, the entire board and the District's superintendent unanimously supported the reform agenda.

¶4 In 2013, four school board seats were up for election. In February of that year, the District contracted with the American Enterprise Institute ("AEI") to prepare a white paper about Douglas County's school system. This white paper, authored by Dr. Frederick M. Hess and Max Eden of AEI, ultimately became known as the Hess Report.

¶5 The agreement between the District and AEI stated that AEI would "research, create, publish[,] and publicize" a twenty-five- to thirty-page white paper that would:

    a. Describe Douglas County, the school system, and [the superintendent's] background and experience.
    b. Describe some of the problems that Douglas County's efforts are meant to address.
    c. Describe what Douglas County is doing in terms of curriculum, instruction, programs, systems in place, etc.
    d. Explain how this is new and different; describe some of the advantages of the model.
    e. Delineate some of the challenges Douglas County faces based on this model.
    f. Explain lessons learned from the model.

4

The District agreed to pay AEI $30,000 for the report, $15,000 of which was ultimately paid by the District, and $15,000 of which was paid by the Douglas County School District Foundation, a non-profit organization.

¶6 AEI's research assistant wrote to the District's community relations officer in advance of a research visit to Colorado, seeking guidance from the District regarding the focus and direction of the report:

> Ideally we would love for you all to help us help you. We can touch base on this as the date draws closer, but we would prefer not to go out there with a blank slate. Rather, we would prefer it if you would tell us what you want us to focus on, what is most worthy of attention, what you'd like to see written about and what your general angle on it (and the paper) is. This is just something to flag to [the superintendent] so she can mull it over a bit. Perhaps all of the interviews are already lined up with a certain focus in mind, but if not we encourage you to tailor our time out there to directed interviews with folks that you want to make a particular point of in us meeting and writing about them.

¶7 The District thus worked with AEI as it conducted research, and made changes to the draft report.

¶8 AEI finalized and published the twenty-two-page Hess Report in September 2013. Relevant here, the Report described the reform agenda as "perhaps the nation's boldest attempt at suburban school reform"; "unusually ambitious"; "remarkable in the annals of contemporary school reform"; and "remarkable and illuminating." The report contained brief profiles of each of the existing board members. An approximately three-page section called "Electing a Reform Board" described the history of the existing board and noted that Douglas County provided a "compelling illustration of how a unified board majority can fuel rapid, ambitious reform." At the end of that

5

section, the report noted rumored efforts to defeat the four incumbent board members up for re-election:

> Four board members will stand for reelection in November 2013. As they prepare, there are murmurs that the [American Federation of Teachers] might spend substantial sums to defeat them. Several Colorado Democrats have made similar noises. The November results promise to say a great deal about where matters stand in [Douglas County], and may shed light on the position of teachers['] unions in conservative communities across America.

The report also discussed a number of other topics, including the District's voucher program, new assessment methods, changes to teacher pay, and efforts to use big data tools.

¶9 On September 18, 2013, the District emailed its weekly e-newsletter to approximately 85,000 Douglas County residents. Among several articles, the e-newsletter contained a headline that read "[Douglas County School District]: 'The most interesting school district in America.'" The text below the headline referred to the Hess Report and read, in part, that the "paper focuses on Douglas County reforms including choice and pay for performance." The newsletter provided a link through which readers could access and download the full Hess Report.

¶10 Shortly thereafter, Keim filed a campaign finance complaint against the District with the Secretary of State under article XXVIII, section 9(2)(a) of the Colorado Constitution. Keim alleged that the District "violated the [FCPA], C.R.S. § 1-45-101 et seq., by using district resources to influence the outcome of the school board election." Keim stated that four school board candidates (including two incumbent board members) were running as the "Reform Slate." She alleged that "[d]uring the election

6

process" the District disseminated the Hess Report and another white paper,[1] both of which were "political in nature" and "part of campaign literature supporting the Reform Slate." She further argued that "District resources were used in the research, compilation, preparation, and dissemination" of the Hess Report, which was "supportive of the platform advocated by the Reform Slate, and being used to influence the outcome of the election."

¶11 In its answer, the District admitted that District resources were used to fund the Hess Report, but denied that the report was political in nature and denied that it had used District resources to influence the outcome of the board election. The District stated it had no knowledge of how the report was used by any board candidates, and it denied Keim's allegation that the District made the report available to the public "for the purpose of assisting specific candidates."

¶12 At a two-day hearing before the Administrative Law Judge ("ALJ") in December 2013, Keim clarified that her claim was based on section 1-45-117(1)(a)(I), which prohibits political subdivisions of the state from making any "contribution" in a campaign "involving the nomination, retention, or election of any person to any public office." Keim noted that the state constitutional definition of "contribution" includes "[a]nything of value given directly, or indirectly, to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election." See Colo. Const. art. XXVIII, § 2(5)(a)(IV). She argued that the Hess Report was a prohibited "indirect

---

[1] Keim's complaint also challenged another white paper discussing school reform in Douglas County called the Bennett Report. That report is not at issue in this appeal.

7

contribution" because it provided an "indirect benefit to all of the Reform Slate Candidates."

¶13   In a written order, the ALJ concluded that the District violated the FCPA by contracting for and disseminating the Hess Report. The ALJ found that "AEI was hired to write a report of which the District would approve, and not an independent review," that the "Hess Report was commissioned and published as a means to support . . . the reform agenda and any candidates who would further that agenda," and that "the District spent public funds to influence the outcome of the Board election when it commissioned and paid $15,000 for the Hess Report." The ALJ concluded that the report was an "endorsement of the reform agenda," and that each of the reform slate candidates "received a contribution when the District released a link to the Hess Report to 85,000 people, many of whom would be voters in the November 2013 Board election." Thus, the ALJ concluded, the District violated the FCPA when it sent the Hess Report, for which it had paid $15,000 in District funds, via email on September 18, 2013.

¶14   The District appealed, and the court of appeals reversed in a divided opinion. Keim v. Douglas Cty. Sch. Dist., 2015 COA 61, ¶ 1, ___ P.3d ___, ___. The panel majority focused on the meaning of the phrase "given, directly or indirectly, to a candidate" in the constitutional definition of "contribution." Id. at ¶¶ 33–35 (citing Colo. Const. art. XXVIII, § 2(5)(a)(IV)). The majority reasoned that, applying the plain meaning of the words used in the definition, "indirectly giving something of value to a candidate must, at a minimum, involve providing something of value to someone other

8

than the candidate himself or herself but with the intention that the candidate will eventually receive or make use of that thing of value." Id. at ¶ 38. The court concluded that the definition of "contribution" in article XXVIII, section 2(5)(a)(IV) thus requires that "(1) a thing of value (2) be put into the possession of or provided to a candidate or someone acting on the candidate's behalf (3) with the intention that the candidate receive or make use of the thing of value provided (4) in order to promote the candidate's election," but that the candidate need not personally receive and accept the thing of value. Id. at ¶ 39.

¶15  Applying this definition, the panel majority held that the evidence did not establish that "the District put the Hess Report into the possession of, or otherwise provided it to, any candidate or someone acting on behalf of a candidate." Id. at ¶ 40. The majority concluded that the ALJ applied an incorrect legal standard in reaching its conclusion that the District violated the FCPA. Id. at ¶ 41. The court reasoned that any incidental benefit to a pro-reform candidate as a result of the Hess Report's distribution would not be sufficient to establish that the District made a "contribution" under the applicable definition. Id. The court thus concluded that the record did not support the ALJ's finding that in contracting for and disseminating the Hess Report, the District made a "contribution" in a campaign involving the election of a person to public office, in violation of the FCPA. Id. at ¶ 44.

¶16  In his dissent, Judge Taubman disagreed with the majority's conclusion that something of value must be placed in the possession of a third party for an indirect contribution to occur. Id. at ¶ 66 (Taubman, J., dissenting). Nothing in the definition of

9

"contribution," Judge Taubman noted, requires the presence of an intermediary or conduit. Id. at ¶ 69. Further, Judge Taubman disagreed with the majority's interpretation of the definition "to the extent that it requires that something of value must be given to someone acting on the candidate's behalf," because that requirement does not appear in the definition. Id. at ¶ 72. Finally, he reasoned that, even applying the majority's framework, the "District violated the FCPA once it paid AEI $15,000 in public funds for a report promoting the candidacies of pro-reform agenda candidates." Id. at ¶ 78.

¶17 Keim filed a petition for a writ of certiorari, contending that the court of appeals incorrectly interpreted the definition of "contribution" and incorrectly concluded that the evidence did not support the ALJ's findings and conclusions. We granted certiorari review[2] and now affirm the judgment of the court of appeals.

---

[2] We granted certiorari review of the following issues:

1. Whether an "indirect campaign contribution," as prohibited by Colorado's Fair Campaign Practices Act, requires that something of value be placed in the possession of a third party for the benefit of a candidate.

2. Whether the court of appeals' decision in this case conflicts with the court of appeals' decision in the case of Colorado Ethics Watch v. City and County of Broomfield, 203 P.3d 623, 626 (Colo. App. 2009), which held that the court must accept an Administrative Law Judge's (ALJ) factual findings as to whether the district intended to give the contribution "for the purpose of promoting a candidate's election," unless the findings are clearly erroneous or unsupported by evidence in the record.

3. Whether the court of appeals erred in concluding that the record did not support the ALJ's determination that the District violated fair campaign practice laws by contracting for and disseminating the Hess Report.

10

## II. Standard of Review

The interpretation of a constitutional provision is a question of law this court reviews de novo. People v. Boyd, 2017 CO 2, ¶ 3, 387 P.3d 755, 756–57. When construing a constitutional provision, this court must give effect to the intent of the electorate that adopted it. Colo. Ethics Watch v. Senate Majority Fund, LLC, 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253. To do so, this court gives words "their ordinary and popular meaning." Id., 269 P.3d at 1253-54 (quoting Davidson v. Sandstrom, 83 P.3d 648, 654 (Colo. 2004)). If the language of a provision is clear and unambiguous, it must be enforced as written. Id., 269 P.3d at 1254.

Judicial review of agency action is governed by section 24-4-106(7), C.R.S. (2016). Under that standard, a reviewing court will set aside agency action where it is arbitrary and capricious, unsupported by substantial evidence when the record is considered as a whole, or contrary to law. Id. "[I]t is for this court to determine all questions of law, interpret applicable statutes, and apply such interpretations to the facts." Coffman v. Colo. Common Cause, 102 P.3d 999, 1005 (Colo. 2004).

## III. Analysis

Keim alleges that the District made a prohibited campaign contribution under section 1-45-117(1)(a)(I) of the FCPA. Because the FCPA adopts the definition of "contribution" used in article XXVIII, section 2(5) of the Colorado Constitution, see § 1-45-103(6)(a), C.R.S. (2016), this case turns on that constitutional definition, specifically, the definition of "contribution" in article XXVIII, section 2(5)(a)(IV). We conclude that, under section 2(5)(a)(IV), a "contribution" requires that (1) something of

11

value (2) be <u>given to a candidate</u>, directly or indirectly, (3) for the purpose of promoting the candidate's nomination, retention, recall, or election. Because the District did not give the Hess Report to any candidates when it included a link to the report in an email broadly disseminated to Douglas County residents, we hold that the ALJ erred in determining that the District made a prohibited "contribution" in violation of section 1-45-117(1)(a)(I) of the FCPA.

¶21    We begin our analysis by reviewing the relevant legal context in which the term "contribution" emerges. We then examine that term before evaluating whether the Hess Report was a prohibited contribution under section 1-45-117(1)(a)(I) of the FCPA.

### A. The Fair Campaign Practices Act and the Colorado Constitution

¶22    Colorado's Fair Campaign Practices Act ("FCPA" or the "Act"), sections 1-45-101 to –118, C.R.S. (2016), was first enacted by the legislature in 1974 as the "Campaign Reform Act." See <u>Colo. Common Cause</u>, 102 P.3d at 1006; 1974 Colo. Sess. Laws 261–271. The Act was repealed and reenacted by voter initiative in 1996 and has been amended several times since its original adoption, but its core purpose has remained the same. See <u>Colo. Common Cause</u>, 102 P.3d at 1007. According to the Act's legislative declaration, the interests of the public are best served by limiting campaign contributions, establishing campaign spending limits, requiring disclosure of campaign contributions, and providing for strong enforcement of the campaign laws. § 1-45-102, C.R.S. (2016).

¶23 The Act regulates campaign contributions by individual contributors and special interest groups. Colo. Common Cause, 102 P.3d at 1007. Relevant here, the FCPA "regulates expenditure of public monies by state agencies, departments, officials, and employees to prevent the state machinery from thwarting the electoral process." Id. In particular, section 1-45-117 of the FCPA prohibits political subdivisions of the state from making contributions in campaigns; from donating to other persons to make independent expenditures; and from expending money or making contributions to urge electors to vote for or against any ballot issue, referred measure, or recall measure:

> No agency, department, board, division, bureau, commission, or council of the state or any political subdivision of the state shall make any contribution in campaigns involving the nomination, retention, or election of any person to any public office, nor shall any such entity make any donation to any other person for the purpose of making an independent expenditure, nor shall any such entity expend any moneys from any source, or make any contributions, to urge electors to vote in favor of or against any [ballot issue, referred measure, or recall measure].

§ 1-45-117(1)(a)(I), C.R.S. (2016). As originally enacted, the "expressed purpose" of the provision now codified in section 117 was to "prevent state or political subdivisions from devoting public resources toward persuading voters during an election." Colo. Common Cause, 102 P.3d at 1006 (citing Hearing on S. B. 28, S. State Affairs Comm., 49th Gen. Assemb., 2nd Regular Sess. (1974)). Although it has been codified in different locations and formats, a statutory prohibition on contributions to campaigns by state and political subdivisions has existed in Colorado campaign finance law since 1974. See, e.g., § 1-45-116, C.R.S. (1973); § 1-45-116(1)(a)(I), C.R.S. (1996 Supp.).

¶24    Keim alleges that the District made a prohibited "contribution" to candidates for the 2013 Douglas County school board election in violation of section 1-45-117(1)(a)(I) ("No . . . political subdivision of the state shall make any <u>contribution</u> in campaigns involving the nomination, retention, or election of any person to any public office . . . ." (emphasis added)). The Colorado Constitution defines "contribution" to include, among other things, "[a]nything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election." Colo. Const. art. XXVIII, § 2(5)(a)(IV).[3]  In turn, the FCPA provides that "contribution" shall have the same meaning as set forth in the Colorado Constitution. § 1-45-103(6)(a).[4]

---

[3] Under section (2)(5)(a), a "contribution" can also include money and gifts or loans given to a political party or candidate committee, issue committee, political committee, or small donor committee, as well as payments made to third parties for the benefit of a political party or such committees:

> (I) The payment, loan, pledge, gift, or advance of money, or guarantee of a loan, made to any candidate committee, issue committee, political committee, small donor committee, or political party;
>
> (II) Any payment made to a third party for the benefit of any candidate committee, issue committee, political committee, small donor committee, or political party;
>
> (III) The fair market value of any gift or loan of property made to any candidate committee, issue committee, political committee, small donor committee or political party.

Colo. Const. art. XXVIII, § 2(5)(a)(I)–(III).  Keim does not contend that the District made a contribution under these definitions.

[4] The FCPA further defines "contribution" to include the value in excess of the compensation or consideration received by a contributor for donations of goods or services to a candidate committee, and also defines "contributions" made to "political organizations," a term that does not appear in the state constitutional campaign finance provisions:

## B. The Meaning of "Contribution" under Section (2)(5)(a)(IV)

¶25    Consistent with our task of giving words their ordinary and popular meaning and enforcing the language of a clear and unambiguous provision as written, we conclude that a "contribution" under section (2)(5)(a)(IV) requires that: (1) a thing of value (2) be given to a candidate, either directly or indirectly, (3) in order to promote the candidate's nomination, retention, recall, or election.  See Colo. Const. art. XXVIII, § 2(5)(a)(IV).

¶26    The definition of "contribution" in section (2)(5)(a)(IV) is both broader and narrower than the other definitions in the Colorado Constitution and FCPA.  It is broader in the sense that it refers to "anything of value" and thus is not limited to the list of items set forth in the other definitions.  For example, other definitions of "contribution" in the constitution and the FCPA refer specifically to payments, loans, pledges, gifts, advances of money, guarantees of a loan, or the fair market value of any

---

(b) "Contribution" includes, with regard to a contribution for which the contributor receives compensation or consideration of less than equivalent value to such contribution, including, but not limited to, items of perishable or nonpermanent value, goods, supplies, services, or participation in a campaign-related event, an amount equal to the value in excess of such compensation or consideration as determined by the candidate committee.

(c) "Contribution" also includes:

(I) Any payment, loan, pledge, gift, advance of money, or guarantee of a loan made to any political organization;

(II) Any payment made to a third party on behalf of and with the knowledge of the political organization; or

(III) The fair market value of any gift or loan of property made to any political organization.

§ 1-45-103(6)(b)–(c).  These additional definitions are not at issue in this case.

gift or loan of property, and pertain to such contributions made to candidate committees, issue committees, political committees, small donor committees, political parties, or political organizations; these include payments made to third parties for the benefit of such committees, political parties, or political organizations. <u>See</u> Colo. Const. art. XXVIII, § 2(5)(a)(I)–(III); § 1-45-103(6)(b)–(c). It is also narrower than the other definitions because it applies only to contributions made to an individual candidate, and unlike the other definitions, subparagraph IV includes a purpose requirement (i.e., "to a candidate, for the purpose of promoting the candidate's nomination, retention, recall, or election"). <u>See</u> Colo. Const. art. XXVIII, § 2(5)(a)(IV).

¶27 In this case, we are focused on the meaning of the phrase "given, directly or indirectly, to a candidate" in section (2)(5)(a)(IV). Under any natural reading, the phrase "given . . . to a candidate" means the contributor must intend the candidate to receive the thing of value given by the contributor. As the court of appeals noted, "give" means "to put into the possession of another for his use." <u>Keim</u>, ¶ 34 (citing <u>Give</u>, <u>Webster's Third New International Dictionary</u> (unabr. ed. 2002)). And in the phrase "given . . . to," the word "to" is "a function word to indicate the receiver of an action or the one for which something is done or exists." <u>Id.</u> (citing <u>To</u>, <u>Webster's Third New International Dictionary</u> (unabr. ed. 2002)).

¶28 Next, the adverb phrase "directly or indirectly" modifies the contributor's act of giving to the candidate. Thus, a "contribution" under section (2)(5)(a)(IV) requires that a contributor give something of value "<u>to a candidate</u>," but acknowledges that the contributor's act of giving may occur either "directly or indirectly." (Emphasis added.)

16

In other words, the candidate may receive the thing of value "directly" from the contributor; alternatively, the candidate may receive the thing of value from the contributor "indirectly" through one or more intermediaries. In either case, however, the candidate must ultimately receive the thing of value given by the contributor.

¶29 Although a thing of value "put into the possession of or provided to . . . someone acting on the candidate's behalf" can qualify as a "contribution" under subparagraph IV, see Keim, ¶ 39, we disagree with the court of appeals that the definition limits indirect contributions under that provision to things of value given to persons "acting on the candidate's behalf," as those words do not appear in subparagraph IV. In any event, a contribution made to someone "acting on the candidate's behalf" often will fall under a different definition of contribution. As noted above, the Colorado Constitution defines "contribution" to include the "payment, loan, pledge, gift, or advance of money, or guarantee of a loan, made to any candidate committee"; a "payment made to a third party for the benefit of any candidate committee"; and the "fair market value of any gift or loan of property made to any candidate committee." Colo. Const. art. XXVIII, § 2(5)(a)(I)–(III). In turn, a "candidate committee" includes "a person . . . or persons with the common purpose of receiving contributions . . . under the authority of a candidate." Colo. Const. art. XXVIII, § 2(3).[5] Thus, a person who is "acting on the

---

[5] The Colorado Constitution defines "candidate committee" as "a person, including the candidate, or persons with the common purpose of receiving contributions or making expenditures under the authority of a candidate. A contribution to a candidate shall be deemed a contribution to the candidate's candidate committee." Colo. Const. art. XXVIII, § 2(3).

17

candidate's behalf" presumably acts "under the authority of a candidate" to receive contributions, and therefore is part of the candidate's candidate committee. Accordingly, a contribution given to such an individual often will qualify as a contribution under a different provision of the Colorado Constitution. See Colo. Const. art. XXVIII, § 2(5)(a)(I)–(III).

## C. Application

¶30 As explained above, a "contribution" under section (2)(5)(a)(IV) requires that: (1) a thing of value (2) be given to a candidate, either directly or indirectly, (3) in order to promote the candidate's nomination, retention, recall, or election. See Colo. Const. art. XXVIII, § 2(5)(a)(IV). In this case, we conclude that the District did not make a prohibited "contribution" to a campaign under section (2)(5)(a)(IV) and section 1-45-117(1)(a)(I) because the District did not give the Hess Report, directly or indirectly, to any school board candidate when it disseminated the email containing a link to the report to Douglas County residents. Because we conclude that the Hess Report was not "given directly or indirectly, to [any] candidate," we need not address whether the Hess Report was given "for the purpose of promoting [any] candidate's . . . election."

¶31 We assume that the Hess Report qualifies as a "thing of value" for purposes of the definition of "contribution" in section (2)(5)(a)(IV). Here, the ALJ concluded that each of the reform slate candidates "received a contribution" when the District emailed a link to the Hess Report in its weekly e-newsletter distributed to the 85,000 Douglas County residents on the District's mailing list. However, the facts here do not establish that the District gave the Hess Report to the candidates as required by the applicable

18

definition of "contribution." We reject the notion that something of value can be "given to" a candidate when it is publicly distributed, even if the candidates happen to be among the public to which the thing of value has been made available.

¶32 To the extent Keim argues that the Hess Report qualified as a "contribution" under section (2)(5)(a)(IV) because it provided an "indirect benefit" to the reform slate candidates, we reject that contention. As explained above, the adverb phrase "directly or indirectly" in subparagraph IV modifies the contributor's act of giving a thing of value to the candidate, and acknowledges that a candidate may receive a thing of value "directly" from the contributor or "indirectly" through an intermediary. But the phrase "directly or indirectly" does not modify "anything of value." In short, the definition of "contribution" in subparagraph IV cannot be construed so broadly to encompass anything of value that might "indirectly benefit" a candidate's nomination, retention, recall, or election.

¶33 Similarly, Keim contends that the Hess Report was "given to" the reform candidates because they were the recipients of the "benefits" of the report in the general sense. In other words, Keim argues, the Hess Report amounted to an endorsement of the reform agenda and explained the advantage of having a unified board to implement that agenda; the reform candidates received the benefit of that endorsement when the District distributed the report to Douglas County residents. Keim reasons that the purpose of the prohibition in section 1-45-117(1)(a)(I) is to prevent political subdivisions of the state from using public funds to influence the outcome of an election. She argues that the District violated section 1-45-117(1)(a)(I) in this case because a "government

19

actor" used "government funds" for the purpose of promoting particular candidates in an upcoming election. However, this argument falls short because it ignores the requirement in subparagraph IV that something of value be "given to . . . [the] candidate" to qualify as a "contribution." Despite Keim's accurate characterization of the purpose of section 1-45-117(1)(a)(I), we cannot ignore the plain language of the applicable definition of "contribution," which requires that the thing of value be "<u>given</u>, directly or indirectly, <u>to a candidate</u>." Colo. Const. art. XXVIII, § 2(5)(IV) (emphases added).

¶34    In sum, we hold that the District did not make a prohibited "contribution" to a campaign under section 2(5)(a)(IV) in violation of section 1-45-117(1)(a)(I) of the FCPA because the District did not give the Hess Report, directly or indirectly, to any school board candidate when it broadly disseminated the email containing a link to the report to Douglas County residents. Because we conclude that the Hess Report was not a "contribution" under subparagraph IV because it was not "given, directly or indirectly, to [any] candidate," we need not address whether the Hess Report was created and distributed "for the purpose of promoting [any] candidate's . . . election."[6] Accordingly, we hold that the ALJ erred in concluding that the District violated section 1-45-117(1)(a)(I) by contracting for and disseminating the report to Douglas County residents.

---

[6] Likewise, we need not reach whether the court of appeals' decision in this case conflicts with the court of appeals' decision in <u>Colorado Ethics Watch v. City and County of Broomfield</u>, 203 P.3d 623 (Colo. App. 2009).

## IV. Conclusion

¶35    We hold that the definition of "contribution" at issue here requires that: (1) a thing of value (2) be given to a candidate, either directly or indirectly, (3) in order to promote the candidate's election.  See Colo. Const. art. XXVIII, § 2(5)(a)(IV).  Here, the District did not give anything of value to the reform slate candidates when it publicly distributed the Hess Report to residents in Douglas County.  We therefore affirm the judgment of the court of appeals.

**JUSTICE GABRIEL** does not participate.